## In the
# United States Court of Appeals
## For the Seventh Circuit

No. 11-3190

FLAVA WORKS, INC.,

*Plaintiff-Appellee*,

*v.*

MARQUES RONDALE GUNTER, doing business as
myVidster.com; and SALSAINDY, LLC,

*Defendants-Appellants*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 C 6517—**John F. Grady**, *Judge*.

ARGUED MAY 25, 2012—DECIDED AUGUST 2, 2012

Before POSNER, FLAUM, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. The defendants ("myVidster" for short) appeal from the grant of a preliminary injunction in a suit by Flava Works for copyright infringement. The district judge based the injunction on his finding that myVidster is a contributory infringer (more precisely, that the trier of fact would probably

find this to be the case in a full trial)—in other words, roughly an infringer's accomplice. See *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005); *Kalem Co. v. Harper Brothers*, 222 U.S. 55, 62-63 (1911) (Holmes, J.); *In re Aimster Copyright Litigation*, 334 F.3d 643, 651 (7th Cir. 2003); 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.04[A][3], pp. 12-84 to 12-85 (2012). As we explained in *Aimster*, "Recognizing the impracticability or futility of a copyright owner's suing a multitude of individual infringers ('chasing individual consumers is time consuming and is a teaspoon solution to an ocean problem,' Randal C. Picker, 'Copyright as Entry Policy: The Case of Digital Distribution,' 47 *Antitrust Bull*. 423, 442 (2002)), the law allows a copyright holder to sue a contributor to the infringement instead, in effect as an aider and abettor. Another analogy is to the tort of intentional interference with contract, that is, inducing a breach of contract. See, e.g., *Sufrin v. Hosier*, 128 F.3d 594, 597 (7th Cir. 1997). If a breach of contract (and a copyright license is just a type of contract) can be prevented most effectively by actions taken by a third party, it makes sense to have a legal mechanism for placing liability for the consequences of the breach on him as well as on the party that broke the contract." 334 F.3d at 645-46.

The district judge in this case erred at the outset by saying that "as a practical matter, the analysis boils down to a single factor—the plaintiff's likelihood of success." He based this assertion on the statement in *Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 620 (7th Cir. 1982), that "irreparable

injury may normally be presumed from a showing of copyright infringement." But the Supreme Court's subsequent decision in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392-93 (2006), made clear that there is no such presumption; and though that was a case about patents rather than copyrights and about permanent rather than preliminary injunctions, we are persuaded by *Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 995-96, 998 (9th Cir. 2011) (per curiam), and *Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010), that *eBay* governs a motion for a preliminary injunction in a copyright case, as well. See also *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22-24 (2008). Therefore likelihood of success was only one factor for the district judge to consider in deciding whether to grant a preliminary injunction. But as that is the only factor the parties discuss (apart from a perfunctory and conjectural contention by Flava that no one who becomes habituated to seeing videos for free on myVidster will pay to see them on Flava's website or buy DVDs of them from Flava unless the preliminary injunction is upheld), we can confine our analysis to it.

Flava specializes in the production and distribution of videos of black men engaged in homosexual acts. Although some people would disapprove of such a service, there is no suggestion that it is illegal; and anyway the prevailing view is that even illegality is not a bar to copyrightability. *Jartech, Inc. v. Clancy*, 666 F.2d 403, 406 (9th Cir. 1982); *Mitchell Brothers Film Group v. Cinema Adult Theater*, 604 F.2d 852, 854-55 (5th Cir.

1979); *Belcher v. Tarbox*, 486 F.2d 1087, 1088 (9th Cir. 1973); 1 Nimmer & Nimmer, *supra*, § 2.17, pp. 2-195 to 2-197. As pointed out in the *Jartech* case, "obscenity is a community standard which may vary to the extent that controls thereof may be dropped by a state altogether. *Paris Adult Theatre I v. Slaton*, 413 U.S. 49 (1973*); United States v. 2,200 Paper Back Books*, 565 F.2d 566, 569-70 (9th Cir. 1977). Acceptance of an obscenity defense would fragment copyright enforcement, protecting registered materials in a certain community, while, in effect, authorizing pirating in another locale." 666 F.2d at 406. A separate question, which is unresolved, and is unnecessary to resolve in this case, is the applicability of the doctrine of *in pari delicto* (equally at fault), which we discussed recently in *Schlueter v. Latek*, 683 F.3d 350, 355-56 (7th Cir. 2012), to an infringement suit by the holder of copyright on an illegal work. It could be argued that the courts shouldn't be bothered with a suit that, whichever side wins, will have been won by a wrongdoer. No matter; as we said, there is no contention that any of Flava's videos are illegal.

The websites that host them are behind a "pay wall"; that is, access to them (except for previews) is available only upon payment of a fee in advance. The user must agree not to copy, transmit, sell, etc. the video, although Flava's terms of use permit the user to download it to his computer for his "personal, noncommercial use"—only.

Enter myVidster, an online service engaged in what is called "social bookmarking"—enabling individuals

who have similar tastes to point one another (and actually provide one another access) to online materials that cater to those tastes, by bookmarking materials on the social-bookmarking service's website. We need to describe how this works.

Patrons of myVidster find videos on the Internet, and if they want to make them available to other patrons of myVidster (who apparently can be anyone—as far as we can discern from the record all content on myVidster is publicly accessible) "bookmark" (note) them on myVidster's website. Upon receiving the bookmark myVidster automatically requests the video's "embed code" from the server that hosts (that is, stores) the video. In the present context "server" denotes a specialized computer for storing and transmitting bulky online materials, like videos. When you upload a video to the Internet, the video is stored on a server that transmits the video to other Internet users' computers on request.

The embed code contains the video's web address plus instructions for how to display the video. Armed with that code, myVidster creates a web page that makes the video appear to be on myVidster's site. When you visit the site, that video and other videos appear, each in the form of a "thumbnail," a miniature picture of a video's opening screen shot. A click on a thumbnail activates computer code that connects the visitor's computer to the server; the connection made, the visitor is now watching the video. He's watching it through a frame that myVidster has put around it, containing ads (it's by selling ads for display on its website that

myVidster finances its operation). He may think, therefore, that he's seeing the video on myVidster's website. But actually the video is being transmitted directly from the server on which the video is stored to the viewer's computer. Someone had uploaded the video to that server, and later a subscriber to myVidster had come across it and decided to bookmark it. This led to the creation of a page on myVidster's website and by clicking on the page other visitors to myVidster can now view the video—but on the server that hosts the video, not on myVidster's website; the bookmarked video is not posted on myVidster's website.

Uploading a video to the Internet is commonplace and simple to do. See, e.g., Philip Bloom, "Uploading Videos to the Internet: Six Easy-to-Follow Steps," www.ppmag.com/web-exclusives/2010/03/video-to-internet.html (visited July 25, 2012). And once uploaded it is easy to send to a friend to view and is easily found in a search of the web and viewed. Uploading is the source of the immense number of videos viewable on YouTube. See "YouTube," *Wikipedia*, http://en.wikipedia.org/wiki/YouTube (visited July 25, 2012). But if the uploaded video is copyrighted, the uploader has (depending on the terms of use) infringed the copyright. A customer of Flava is authorized only to download the video (or if he obtained it on a DVD sold by Flava, to copy it to his computer) for his personal use. If instead he uploaded it to the Internet and so by doing so created a copy (because the downloaded video remains in his computer), he was infringing.

Is myVidster therefore a contributory infringer if a visitor to its website bookmarks the video and later someone clicks on the bookmark and views the video? myVidster is not *just* adding a frame around the video screen that the visitor is watching. Like a telephone exchange connecting two telephones, it is providing a connection between the server that hosts the video and the computer of myVidster's visitor. But as long as the visitor makes no copy of the copyrighted video that he is watching, he is not violating the copyright owner's exclusive right, conferred by the Copyright Act, "to reproduce the copyrighted work in copies" and "distribute copies . . . of the copyrighted work to the public." 17 U.S.C. §§ 106(1), (3). His bypassing Flava's pay wall by viewing the uploaded copy is equivalent to stealing a copyrighted book from a bookstore and reading it. That is a bad thing to do (in either case) but it is not copyright infringement. The infringer is the customer of Flava who copied Flava's copyrighted video by uploading it to the Internet.

The right to control copying is not the only exclusive right of a copyright owner. That would make life too simple for us. He also has an exclusive right "to perform the copyrighted work publicly." § 106(4). But we begin our analysis with the right to prevent copying and ask whether myVidster is the copiers' accomplice.

A typical, and typically unhelpful, definition of "contributory infringer" is "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Gershwin*

*Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971). Such a one "may be held liable as a 'contributory' infringer." *Id*. But does "*may be held liable*" mean that a person who fits the definition of "contributory infringer" may nevertheless *not* be a contributory infringer after all? And what exactly does "materially contribute" mean? And how does one materially contribute to something without causing or inducing it? And how does "cause" differ from "induce"?

Brevity is the soul of wit and tediousness its limbs and outward flourishes. We therefore prefer the succinct definition of contributory infringement in *Matthew Bender & Co. v. West Publishing Co.*, 158 F.3d 693, 706 (2d Cir. 1998): "personal conduct that encourages or assists the infringement." See also *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007).

Flava contends that by providing a connection to websites that contain illegal copies of its copyrighted videos, myVidster is encouraging its subscribers to circumvent Flava's pay wall, thus reducing Flava's income. No doubt. But unless those visitors copy the videos they are viewing on the infringers' websites, myVidster isn't increasing the amount of infringement. See *Perfect 10, Inc. v. Visa Int'l Service Ass'n*, 494 F.3d 788, 797 (9th Cir. 2007). An employee of Flava who embezzled corporate funds would be doing the same thing—reducing Flava's income—but would not be infringing Flava's copyrights by doing so. myVidster displays names and addresses (that's what the thumbnails are, in effect) of videos hosted elsewhere on the Internet that may or may not be copyrighted. Someone who uses one of those addresses

to bypass Flava's pay wall and watch a copyrighted video for free is no more a copyright infringer than if he had snuck into a movie theater and watched a copyrighted movie without buying a ticket. The facilitator of conduct that doesn't infringe copyright is not a contributory infringer.

A practical objection to stretching the concept of contributory infringement far enough to make a social-bookmarking service a policeman of copyright law is that the service usually won't know whether a video that a visitor bookmarks on the service's website is protected by copyright. Congress addressed this problem in the Digital Millennium Copyright Act of 1998, Pub. L. 105-304, 112 Stat. 2860. The Act provides a safe harbor to Internet service providers. It states that a provider isn't liable for copyright infringement by "referring or linking users to an online location containing infringing material" if it meets certain conditions—it doesn't know the material is infringing, it isn't aware of facts that would make the infringement apparent, upon learning such facts it acts expeditiously to remove or disable access to the infringing material, it doesn't receive a financial benefit directly attributable to the infringing activity, 17 U.S.C. § 512(d), and it terminates repeat infringers. § 512(i)(1)(A). myVidster received "takedown" notices from Flava designed to activate the duty of an Internet service provider to ban repeat infringers from its website, and Flava contends that myVidster failed to comply with the notices. But this is irrelevant unless myVidster is contributing to infringement; a noninfringer doesn't need a safe harbor.

As the record stands (a vital qualification, given that the appeal is from the grant of a preliminary injunction and may therefore be incomplete), myVidster is not an infringer, at least in the form of copying or distributing copies of copyrighted work. The infringers are the uploaders of copyrighted work. There is no evidence that myVidster is encouraging them, which would make it a contributory infringer.

It might seem that the mention in the Digital Millennium Copyright Act of "referring or linking users to an online location containing infringing material" expands the concept of contributory infringement to any reference to, or linkage in the sense of facilitating access to, copyrighted material. But this is implausible, and anyway is not argued by Flava. Taken literally it would make the publication, online or otherwise, of any contact information concerning a copyrighted work a form of contributory infringement. A more plausible interpretation is that Congress wanted to make the safe harbor as capacious as possible—however broadly contributory infringement might be understood, the Internet service provider would be able to avoid liability.

Now if myVidster *invited* people to post copyrighted videos on the Internet without authorization or to bookmark them on its website, it would be liable for *inducing* infringement, *Metro-Goldwyn-Mayer Studios Inc. v. Grokster Ltd.*, *supra*, 545 U.S. at 930, 936—a form of contributory infringement, see *Perfect 10, Inc. v. Amazon.com, Inc.*, *supra*, 508 F.3d at 1170-71, that emphasizes intent over consequence. But inducing infringement was not a ground of the preliminary injunction issued

by the district judge in this case and anyway there is no proof that myVidster has issued any such invitations.

myVidster knows that some of the videos bookmarked on its site infringe copyright, but that doesn't make it a facilitator of copying. Although visitors who view those videos are viewing infringing material, they are paying nothing for it and therefore not encouraging infringement, at least in a material sense, unless perhaps the infringer gets ad revenue every time someone plays the video that he posted on the Internet—but there is no evidence of that. True, bookmarking is a way of making friends on a social network, and one needs something to bookmark, and so if you want to make friends with people who like the kind of videos that Flava produces you may be inclined to upload those videos to the Internet in the hope that someone will bookmark them on myVidster's website and someone else will watch them and be grateful to you. But this is very indirect. For will a visitor to myVidster who watches a bookmarked infringing video know whom to be grateful to—know who uploaded it, thus enabling it to be bookmarked and viewed? That is unlikely. The unauthorized copier—the uploader of the copyrighted video— is not a part of the social network unless he's a myVidster member and uploads the Flava video for the purpose of its being bookmarked on myVidster and somehow gets credit for the bookmarking and for the ensuing viewing of the bookmarked video. There is no evidence that there are any such people.

A term in the conventional definition of contributory infringement—"material contribution"—invokes common law notions of remoteness that limit efforts to impose liability for speculative imaginings of possible causal consequences. As we said in *BCS Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 755 (7th Cir. 2011), "An injury will sometimes have a cascading effect that no potential injurer could calculate in deciding how carefully to act. The effect is clear in hindsight—but only in hindsight." The absence of evidence of myVidster's effect on the amount of infringement of Flava's videos brings concern about remoteness into play.

The absence of evidence arises in part from the fact that although Flava has a specialized subject matter, myVidster does not. It's like YouTube, except that YouTube hosts the videos it provides access to and myVidster as we know does not. Another difference, however, is that YouTube refuses to provide access to pornography, and myVidster, as we also know, is not so choosy—on the contrary. It's true that its home page, www.myvidster.com/ (visited July 4, 2012), lists videos that range from the fighting in Syria to "Obamacare" and "Ugliest Tattoos" and "Why You Should Spiral-Cut Your Wiener" (and yes, that really is about hot dogs), with nary a pornographic video among them. But this is misleading, because in the default setting on myVidster (the setting when you first click on its website) the "family filter" is turned on; if you turn it off, your visit will reveal a mixture of pornographic and nonpornographic videos, with the former predom-

inating, and of those the majority are homosexual and many of the actors in the homosexual videos are black.

But Flava is not the only producer of such videos, and there is no information in the record concerning its market share. All we glean from the record—and it is of no help to Flava—is that of the 1.2 million bookmarks that have been made on myVidster's website, Flava has been able to identify only 300 as bookmarks of copyrighted Flava videos; and we don't know whether any visitors to myVidster's website clicked on any of them and thus actually watched an unauthorized copy of a Flava video. Flava claims that its sales have fallen by 30 to 35 percent and that as a result it probably has lost more than $100,000 in revenue. But it doesn't say over what period the decline in revenue has occurred and it acknowledges that there are at least a dozen websites besides myVidster's on which access to unauthorized copies of Flava's videos can be obtained. So the $100,000 loss in revenue can't be ascribed entirely to myVidster. Indeed, myVidster may have very little—even nothing—to do with Flava's financial troubles.

Google and Facebook in a joint amicus curiae brief friendly to myVidster manage to muddy the waters by analyzing remoteness of injury from an alleged infringement not as a matter of general tort principles but as a species of layer cake. There are the "direct" infringers, who upload copyrighted videos to the Internet without authorization. There are myVidster members who bookmark videos illegally uploaded by the "direct" infringers—the brief describes the bookmarking visitors as

"secondary" infringers. And finally there is myVidster, which connects visitors to its website to the servers that host the infringing videos. The brief describes myVidster as being at worst a "tertiary" infringer, beyond the reach of copyright law because the law doesn't recognize tertiary copyright infringement. But the law doesn't recognize "secondary infringement" either. The only distinctions relevant to this case are between direct infringement (which really ought just to be called infringement—the law doesn't speak of "direct negligence" versus "contributory negligence" or "direct murder" versus "aiding and abetting murder") and contributory infringement, and between contributory infringement and noninfringement. The direct infringers in this case are the uploaders; myVidster is neither a direct nor a contributory infringer—at least of Flava's exclusive right to copy and distribute copies of its copyrighted videos.

That is an essential qualification. So far we've been discussing infringement just by copying, and we can't stop there. For remember that the Copyright Act also makes it unlawful "to perform the copyrighted work publicly," 17 U.S.C. § 106(4), defined, so far as relates to this case, as "to transmit or otherwise communicate a performance . . . of the work . . . to the public . . . whether the members of the public capable of receiving the performance . . . receive it in the same place or in separate places and at the same time or at different times." § 101. One possible interpretation is that uploading plus bookmarking a video is a public performance because it enables a visitor to the website to receive (watch) the

performance at will, and the fact that he will be watching it at a different time or in a different place from the other viewers does not affect its "publicness," as the statute makes clear. We'll call this interpretation, for simplicity, "performance by uploading." An alternative interpretation, however—call it "performance by receiving"—is that the performance occurs only when the work (Flava's video) is transmitted to the viewer's computer—in other words when it is "communicated to the public in a form in which the public can visually or aurally comprehend the work." William F. Patry, *Patry on Copyright* § 14:21, p. 14-41 (2012).

On the first interpretation, performance by uploading, the performance of a movie in a movie theater might by analogy be said to begin not when the audience is seated and the movie begins but a bit earlier, when the operator of the projector loads the film and puts his finger on the start button; while on the second interpretation, performance by receiving, it begins when he presses the button and the reel begins to unwind. The second interpretation is certainly more plausible in the movie-theater setting. But in the setting of our case the viewer rather than the sender (the latter being the uploader of the copyrighted video) determines when the performance begins, and it is odd to think that every transmission of an uploaded video is a public performance. The first interpretation—public performance occurs when the video is uploaded and the public becomes capable of viewing it—is better at giving meaning to "public" in public performance but worse at giving meaning to "performance." Legislative clarifica-

tion of the public-performance provision of the Copyright Act would therefore be most welcome.

The second interpretation—the performance occurs when the video is viewed—is more favorable to Flava, because myVidster plays a role there and not in uploading. So we're surprised that Flava doesn't urge it. The first interpretation is hopeless for Flava. For there is no evidence that myVidster is contributing to the decision of someone to upload a Flava video to the Internet, where it then becomes available to be bookmarked on myVidster's website. myVidster is giving web surfers addresses where they can find entertainment. By listing plays and giving the name and address of the theaters where they are being performed, the *New Yorker* is not performing them. It is not "transmitting or communicating" them. Cf. *Perfect 10, Inc. v. Amazon.com, Inc., supra*, 508 F.3d at 1159-61; *In re Aimster Copyright Litigation, supra*, 334 F.3d at 646-47.

Is myVidster doing anything different? To call the provision of contact information transmission or communication and thus make myVidster a direct infringer would blur the distinction between direct and contributory infringement and by doing so make the provider of such information an infringer even if he didn't know that the work to which he was directing a visitor to his website was copyrighted. Then he would have to search for a safe harbor in the Digital Millennium Copyright Act. myVidster doesn't touch the data stream, which flows directly from one computer to another, neither being owned or operated by myVidster. Compare *National Football League v.*

*PrimeTime 24 Joint Venture*, 211 F.3d 10, 13 (2d Cir. 2000), a retransmission case.

But if the public performance is the transmission of the video when the visitor to myVidster's website clicks on the video's thumbnail (the second interpretation) and viewing begins, there is an argument that even though the video uploader is responsible for the transmitting and not myVidster, myVidster is assisting the transmission by providing the link between the uploader and the viewer, and is thus facilitating public performance. There is a remote analogy to the "swap meet" operated by the defendant in *Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 262 (9th Cir. 1996). That was a flea market in which, as the defendant knew, pirated recordings of music copyrighted by the plaintiff were sold in such bulk that the subsequent performance by the buyers (when they played the recordings) may have satisfied the broad definition of public performance in the Copyright Act, although the opinion doesn't say whether the infringement consisted of unauthorized distribution of copies or unauthorized public performance and probably meant the former. Under either interpretation the swap meet operator was providing "support services" without which "it would [have been] difficult for the infringing activity to take place in the massive quantities alleged." *Id.* at 264.

In contrast, Flava's pirated videos are not sold, and there isn't even admissible evidence that they're actually being accessed via myVidster, rather than via other websites, and if they are not, myVidster is not

contributing to their performance. Unlike the defendant in *Fonovisa*, myVidster is not providing a market for pirated works, because infringers who transmit copyrighted works to myVidster's visitors are not selling them. That isn't determinative, because copyrights can be infringed without a pecuniary motive. But it is relevant to whether myVidster's bookmarking service is actually contributing significantly to the unauthorized performance of Flava's copyrighted works by visitors to myVidster's website. It's not as if myVidster were pushing the uploading of Flava videos because it had a financial incentive to encourage performance of those works, as the swap meet did.

Nor is this case like our *Aimster* case, cited earlier. That was a file-sharing case. Kids wanted to swap recorded music (often copyrighted) over the Internet. The swapping required special software—which Aimster provided. By doing so it created the online equivalent of a swap meet, since anyone equipped with Aimster's software could easily obtain copies of copyrighted songs in AOL chat rooms; the first three letters in "Aimster" were an acronym for "AOL instant messaging." Although it wasn't proved that *all* the swapped recordings were copyrighted, it was apparent that most were—and *maybe* all, for we noted that "Aimster has failed to produce any evidence that its service has *ever* been used for a noninfringing use*." In re Aimster Copyright Litigation*, *supra*, 334 F.3d at 653 (emphasis added). That can't be said about myVidster's social-bookmarking service. Unlike Aimster, it's not encouraging swapping, which in turn

encourages infringement, since without infringement there is nothing to swap.

As should be clear by now, on the record compiled so far in this litigation there is no basis for the grant of a preliminary injunction. That is not to say that Flava can't establish grounds for such an injunction, consistent with the *eBay* standard. It seems at least entitled to an injunction against myVidster's uploading to its website videos in which Flava owns copyrights. Before it was sued by Flava, myVidster had been doing that—making copies of videos that some of its subscribers had posted, including videos copyrighted by Flava. Although myVidster doesn't charge for membership in its social network, it charges a fee for a premium membership that included the backup service. That service infringed Flava's copyrights directly—it didn't just abet others' infringements.

myVidster has stopped offering it. But Flava would still be entitled to an injunction—cessation of an unlawful practice doesn't exonerate a defendant, since unless enjoined he might resume infringing. *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000); *Chicago United Industries, Ltd. v. City of Chicago*, 445 F.3d 940, 947 (7th Cir. 2006). It's thus a surprise that the preliminary injunction doesn't enjoin the backup service, especially since the district judge considered it evidence that myVidster was contributing to the infringing activity of its members. (Actually, though, we've seen that the members were not the in-fringers—the third parties who uploaded Flava videos

to the Internet were the infringers to whose activities myVidster is alleged to have been contributing.) But the judge said that while the "plaintiff also referred in closing argument to its claims of direct copyright infringement and inducement of copyright infringement, . . . its motion for a preliminary injunction is not based on those claims." The backup service was direct infringement—myVidster was copying videos, including some of Flava's, without authorization. Yet as the judge said, Flava didn't make a claim for direct infringement a basis for its motion for preliminary relief. It doesn't seem to be interested in such an injunction. At oral argument, however, myVidster's lawyer said his client wouldn't oppose such an injunction, and maybe this will awaken Flava's interest. This is something for consideration on remand.

Flava may be entitled to additional preliminary injunctive relief as well, if it can show, as it has not shown yet, that myVidster's service really does contribute significantly to infringement of Flava's copyrights. The preliminary injunction that the district court entered must, however, be

VACATED.